Filed 8/21/15  In re N.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.R., a Minor. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067496 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12821) |
| v. | |
| L.R., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

SK Appellate Group and Jennifer L. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group and Tilisha Martin for Minor.

## INTRODUCTION

L.R. appeals following the termination of her parental rights to her minor daughter, N.R.  L.R. contends that the juvenile court erred by declining to apply the beneficial relationship exception to termination of parental rights (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1]  We affirm.

II.

## FACTUAL AND PROCEDURAL BACKGROUND

N.R. was first placed in protective custody by the San Diego County Health and Human Services Agency (the Agency) when she was approximately seven months old, following an incident of domestic violence between her parents, L.R. and F.C., who were ages 16 and 18, respectively.  The Agency's detention report of October 30, 2012, summarized the incident as involving a physical confrontation between a teenage couple, while the couple's infant was in close proximity to the violence.  According to the investigating officer, police officers had been to the residence on six prior occasions during the preceding year due to violence between L.R. and F.C.

As a result of a variety of factors, including L.R.'s unstable housing situation and her need for juvenile court protection herself, as well as F.C.'s incarceration and his

---

[1]     Further statutory references are to the Welfare & Institutions Code unless otherwise indicated.

history of untreated drug use and mental health concerns, both N.R. and L.R. were made dependents of the court, and N.R. was placed in out-of-home care while her parents were provided with reunification services. As of January 3, 2013, N.R. had been placed in the home of a nonrelative extended family member, and the court ordered supervised visitation for both parents.

The Agency's six-month review report issued in June 2013 recommended an additional six months of reunification services for L.R., but recommended termination of reunification services for F.C. N.R. continued to be placed in the nonrelative extended family home. L.R. maintained regular supervised contact with N.R. The review report noted, however, that L.R. failed to take initiative with respect to N.R., in that she had to be reminded when to feed N.R. and change her diaper. L.R. appeared frustrated when N.R. cried, telling her to "shut up" rather than attempting to soothe her. The social worker arranged for parent-child attachment therapy. N.R.'s paternal grandmother visited N.R. regularly each month.

At the six-month status review hearing in August 2013, the court terminated F.C.'s reunification services.[2] The court determined that L.R. had made substantive progress with the provisions of her case plan, and granted her monitored unsupervised visits with N.R. in the caregiver's home.

The following month, the social worker asked the court to order a skeletal survey for N.R. N.R. had a bruise on her forehead and an injury to her abdomen, both with

---

[2]     The termination of F.C.'s reunification services is not at issue in this appeal.

undetermined causes. The social worker sought removal of N.R. from the nonrelative extended family home after the caregiver failed to notify the Agency of N.R.'s injuries and provided inconsistent explanations for the injuries. It was later discovered that N.R. had a healing fracture on her right shoulder, which was not likely to have been caused by accidental means.

In an addendum report dated October 21, 2013, the social worker recommended that N.R. be placed with her paternal grandparents. The paternal grandparents were supportive of having both N.R. and L.R. living together in their home, and would be able to assist in the baby's care. N.R. was placed in the paternal grandparents' home, and the court issued an order permitting L.R. to reside in the same placement as N.R

The 12-month permanency report dated December 30, 2013, indicated that L.R. continued to participate in parent-child attachment therapy. Because N.R. and L.R. were both living in N.R.'s paternal grandparents' home, the social worker was in the process of arranging for in-home parenting services for L.R. The social worker recommended that L.R. receive an additional six months of services. The trial court followed the Agency's recommendation.

In a status review report filed in April 2014, the social worker noted that L.R. remained in the paternal grandparents' home, with N.R., and had been living there for more than five months. The grandmother had been helping L.R. with the baby. L.R. was set to graduate high school in early June 2014, and planned to take classes at a local junior college in the fall of 2014.

4

At the 18-month permanency hearing on April 23, 2014, the court placed N.R. with L.R., and they were offered family maintenance services. The court set a review hearing for six months later.

Two months after being reunified with L.R., N.R. was once again removed from L.R.'s care after L.R. was arrested and charged with child endangerment. The charges arose from an incident in which L.R. and N.R. were passengers in a stolen car. The driver of the car was pursued by law enforcement and ultimately crashed the vehicle. Police found drugs in the car, and the driver and L.R. were determined to have been under the influence of a controlled substance. N.R. was not restrained in a child safety seat during the pursuit.

The social worker who was assigned to L.R.'s dependency case indicated that L.R. refused to talk about the car incident that resulted in N.R.'s second removal from her care. In the social worker's view, L.R. did not seem to be able to appreciate the significance of the issues that she was facing, including the need to find housing and to keep track of her finances. The social worker expressed concern about L.R.'s ability to be on her own, take care of N.R., and make good decisions. The social worker was in the process of arranging for independent living services for L.R., and hoped that these services would assist her in making responsible decisions and in living on her own.

The social worker who was assigned to N.R.'s dependency case was of the opinion that L.R. did not seem to comprehend the severity of the situation in which she put N.R. by getting into the car with a driver who was under the influence of drugs and not

5

restraining N.R. in a child safety seat. The social worker indicated concern that L.R.'s lack of insight could lead to further injury or death of the child. The social worker was of the opinion that N.R. was in need of a safe and stable environment.

In an addendum report dated August 8, 2014, the social worker indicated that L.R. was living with her former foster mother and planned to remain there until she was accepted into a teen housing program. L.R. remained a dependent of the juvenile court. L.R. had been visiting N.R. approximately four times a week at the paternal grandparents' home. When the social worker spoke with L.R. at this point in time, L.R. indicated that she felt "she could not handle a child now" and that "maybe this [i.e. N.R. living with her paternal grandmother] is what is best for her and [N.R.]."

At the hearing on August 8, the trial court removed physical custody of N.R. from L.R. and found that the services that had been provided to L.R. had been reasonable. The court terminated reunification services for L.R., and placed N.R. in the care of relatives. The court scheduled a hearing pursuant to section 366.26 to select and implement a permanent plan for N.R.

Social worker Alba Cuevas prepared the assessment report dated November 17, 2014. Cuevas reported that N.R. was doing well in her placement with her paternal grandparents and was developmentally on target. N.R.'s paternal grandparents were interested in adopting her. Cuevas recommended adoption as the best permanent plan for N.R.

6

Cuevas reported on N.R.'s interactions with L.R. For example, following N.R.'s most recent removal from L.R., there were times when N.R. would cry when L.R. said goodbye. As of December 2014, however, N.R. no longer cried or told L.R. not to leave at the end of visits. N.R. appeared to be doing well, and did not appear to experience emotional distress when separating from L.R. Cuevas noted that during the visits, L.R. would watch television or play with N.R. L.R. would quickly become frustrated when N.R. did not respond to her, and appeared impatient when N.R. would cry. L.R. would repeatedly ask N.R. to stop crying.

Cuevas was of the opinion that N.R. viewed L.R. as an older sister, rather than a parental figure. L.R. had never parented N.R. on her own—rather, she had always relied on the present or former caregivers to meet N.R.'s daily needs.

Cuevas opined that N.R. was likely to be adopted. She was a healthy, well-mannered two-year-old, and aside from the relative caregivers who wished to adopt her, there were more than 100 approved adoptive families seeking to adopt a child like N.R. N.R.'s paternal grandparents were not interested in legal guardianship, but only adoption, because they believed that they could provide the maximum emotional security to N.R. through a plan of adoption.

N.R. referred to her paternal grandparents as "mother" and "father." She had lived with them for a significant portion of her young life, and she sought them out to meet her daily needs. N.R. identified her relative caregivers' home as her own home. The relative

caregivers indicated that they were willing to permit ongoing contact between N.R. and her parents if the caregivers were to become N.R.'s adoptive parents.

In an addendum report, Cuevas confirmed her recommendation for adoption. L.R. and N.R. had continued to have supervised visits, and L.R. and N.R. would watch television together. N.R. did not cry when it was time to say goodbye. According to "information reflected in the narratives from the family visitation center," L.R. still needed help in her interactions with N.R., and the visits often involved N.R. playing on her own, with L.R. observing her play.

At the contested section 366.26 hearing on February 4, 2015, the court received in evidence the Agency's reports and heard testimony from Cuevas.

After considering the evidence, the trial court found by clear and convincing evidence that N.R. was likely to be adopted and that none of the statutory exceptions to adoption applied. The trial court concluded:

> "The court does believe that in general the mother did regularly visit [N.R.], however, the evidence is clear that the relationship between [N.R.] and her mother is not of such weight or benefit to outweigh the benefits of adoption.
>
> "The reports have a theme to them, which is generally that the mother both needs help in parenting the child and that the mother is not very engaged with the child.
>
> "There is little depth or quality to the relationship, although the child clearly has love for her mother and the mother clearly loves [N.R.].
>
> "Not only is there not a parent-child relationship, but at this stage of the proceedings the focus shifts to stability for the child . . . and that weighs heavily.

8

"The court notes that [N.R.] has had five or six placements in her very short life. She was returned to her mother for only a few weeks in April of last year and was removed because of a very unfortunate, but lucky, car chase and accident that [N.R.] was involved in.

"[N.R.] needs stability at this point. She needs to—and the court values that. The court was struck, in addition, in terms of the mother's relationship with the child by the other theme, which was the mother's primary activity with the child during the visitation was looking at television."

The trial court terminated L.R.'s parental rights and referred N.R. to the Agency for adoptive placement. L.R. filed a timely notice of appeal.

III.

DISCUSSION

L.R. does not contest the finding that N.R. is adoptable; rather she contends that the court erred in finding that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i), did not apply to preclude the termination of her parental rights.

A.    *Legal Standards*

If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception to adoption. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

9

This court has interpreted "the 'benefit from continuing the parent[-]child relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.)

The existence of a beneficial relationship is determined by considering "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ."  (*In re Autumn H*., *supra*, 27 Cal.App.4th at p. 576.)  Ultimately, this determination " 'calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption' . . . ."  (*In re J.C*. (2014) 226 Cal.App.4th 503,531.)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence.  [Citation.]  It is not enough to show that the parent and child have a friendly and loving relationship.  [Citation.]  ' "Interaction

10

between [a] natural parent and child will always confer some incidental benefit to the child. . . ." ' [Citation. ] For the exception to apply, 'a parental relationship is necessary[.]' [Citation.] ' "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." [Citation.]' " (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 529.)

In reviewing a trial court's termination of a parent's rights on appeal, we apply the substantial evidence standard of review to the factual issue of whether there is a beneficial parent-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination of parental rights would be detrimental to the child. (*In re J.C., supra*, 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) In applying the substantial evidence standard of review, we do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence; rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.)

11

B.    *Analysis*

The trial court found that L.R. met the first prong of the beneficial relationship exception—i.e., that L.R. maintained regular visitation and contact with N.R.  The court concluded, however, that L.R. failed to establish the second prong of the exception—i.e., that L.R. had a parent-child relationship with N.R. that was so beneficial that terminating L.R.'s parental rights would be detrimental to N.R. (§ 366.26, subd. (c)(1)(B)(i)).

The trial court's determination that L.R. failed to establish that she occupied a parental role in N.R.'s life is supported by substantial evidence.  Again, " '[n]o matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." [Citations.]  The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." [Citation.]' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165.)

N.R., who was just two years old when L.R.'s parental rights were terminated, referred to her caretakers, her paternal grandparents, as "mother" and "father."  N.R. had been living in their home "almost all of her life," identifies that home as her own home, and looked to her paternal grandparents to have her daily needs met.

Although there were reports that N.R. would cry at the end of visits with L.R. in the early stages of the dependency, the social worker reported that N.R. did not once cry

12

at the end of a visit with L.R. during the few months prior to the termination hearing.  In addition, even though N.R. would refer to L.R. as "mommy," the social worker was of the opinion that "the relationship the mother shares with [N.R.] does not rise to the level of demonstrating a significant parental role."  The social worker also observed that "it appear[s] that [N.R.] sees her mother as an older sister who plays with her."  As the social worker pointed out, L.R. "has never parented her child on her own," but "has always relied o[n] [N.R.'s] current and previous caregiver[s] to get [N.R.'s] daily needs met."  In addition, L.R. did not attend N.R.'s medical appointments.

The evidence thus supports the trial court's conclusion that L.R. did not occupy a parental role in N.R.'s life, despite their relatively frequent and consistent contact.  However, even if we were to assume that L.R. did occupy a parental role in N.R.'s life, we would nevertheless affirm on the ground that L.R. has not established that the trial court abused its discretion in concluding that the detrimental impact on N.R. of terminating L.R.'s parental rights would not outweigh the benefits to N.R. of adoption.

Again, N.R. was approximately seven months old when she was initially removed from her parents' care.  From that time through the time the trial court ordered L.R.'s parental rights terminated when N.R. was two years old, N.R. had been in at least three different placements, including one with L.R. that ended after only approximately five weeks.  Thus, for more than half of N.R.'s short life, she was not in L.R.'s custody.  Although at one point in time L.R. had been granted unsupervised visits with N.R., and had managed to progress to the point that N.R. was placed with her, that placement ended

because of a very serious and potentially life-threatening incident in which L.R. showed extremely poor judgment. After that incident, L.R.'s interaction with N.R. involved supervised two- or three-hour visits twice a week.

In addition, the social worker believed that N.R. was likely to be adopted. She was a healthy, well-mannered two-year-old girl who had relative caregivers who were pursuing adoption. In addition, at the time the trial court made its findings, there were more than 100 approved adoptive families wanting to adopt a child like N.R.

We acknowledge that there was evidence, highlighted by L.R. on appeal, that her visits with N.R. generally went well, that they shared an affectionate relationship, and that N.R. seemed to enjoy spending time with L.R. However, this evidence falls short of establishing that the trial court abused its discretion in concluding that the well-being N.R. would gain from being in a permanent home with adoptive parents outweighed any detriment N.R. might suffer from the termination of L.R.'s parental rights. (See *In re K.P., supra,* 203 Cal.App.4th at pp. 622-623.) The fact that L.R. and N.R. appeared to have a "friendly and loving relationship" is not enough for the exception to be invoked.

IV.

DISPOSITION

The judgment is affirmed.

_____

AARON, J.

WE CONCUR:

_____

McDONALD, Acting P. J.

_____

O'ROURKE, J.